**Louis Danzico, Plaintiff-Appellant, v. Beverly Kelly and James Kelly, Defendants-Appellees.**

**Gen. No. 51,861.**

First District, Second Division.

April 22, 1969.

Rehearing denied July 31, 1969.

John C. Sands, Erwin Wright, and Jerome F. Dixon, of Chicago, for appellant.

William P. Nolan, Pretzel, Stouffer, Nolan & Rooney, of Chicago (Joseph B. Lederleitner, of counsel), for appellees.

MR. PRESIDING JUSTICE LYONS delivered the opinion of the court.

This is an appeal by the plaintiff, Louis Danzico, from a judgment for $2,500 entered in his favor for personal injuries and against the defendant, Beverly Kelly, pursuant to the verdict of a jury. (Prior to trial, the co-defendant, James Kelly, who is the husband of Beverly Kelly, was dismissed from the instant litigation on motion of the plaintiff.) In this appeal, the plaintiff asks that the judgment in his favor be reversed and the cause remanded for a new trial on the issue of damages only, or alternatively, that the judgment be reversed and the cause remanded for a new trial on all the issues. The amount of the jury award in this case is less than the damages incurred by the plaintiff for his paid medical expenses and lost time from work. The facts follow.

This case involves a collision which occurred on November 3, 1958, between an automobile driven by the defend-

ant, Beverly Kelly, and a parked Chicago Transit Authority (hereinafter referred to as C.T.A.) truck. As a result of this collision it was alleged that the plaintiff was knocked off his feet and struck his spine against the street curb. At the time of the accident the plaintiff was engaged in his duties as a C.T.A. laborer and was assisting three co-workers in unloading a heavy, wooden, empty salt box from the rear of the parked truck. The collision occurred at approximately noon on Austin Boulevard at and near its intersection with Bloomingdale Avenue in Chicago. The weather was sunny, dry and clear. The evidence shows that the defendant was driving south on Austin Boulevard and struck the rear end of a parked C.T.A. truck which was in the curb lane of southbound Austin Boulevard at the time. At the time of the collision, the plaintiff was standing on Austin Boulevard and had his back turned to southbound Austin Boulevard traffic. He did not see the car of the defendant approaching. As a result of the collision between the car and the truck, the plaintiff dropped the empty salt box, which he had been partially holding with a coemployee, and was thrown against a curb where he struck his spine.

In his amended complaint, the plaintiff charged the defendant with one or more of the following wrongful acts:

(1) Failed to properly operate and control her automobile considering the traffic and the use of of the roadway.

(2) Operated and controlled her automobile without keeping a good and sufficient lookout ahead.

(3) Failed to give warning to persons properly in the roadway.

In its answer, the defendant denied these allegations and averred that the proximate cause of the plaintiff's injury was the negligence of the plaintiff and his co-

16

employee in the operation and unloading of the truck at the time of the collision.

At the trial five eyewitnesses to the collision testified. They were the plaintiff; the defendant; and three members of the C.T.A. crew—John Lubner, who drove the truck in question; Joe Lobue, who was standing on Austin Boulevard with the plaintiff and was aiding him in unloading the empty salt box from the truck; and Salvatore Toia, who was on the truck itself and was tipping the salt box at the time of the collision. The other member of the crew, who was on the truck with Toia, had died prior to trial.

The driver of the C.T.A. truck, John Lubner, testified that the accident occurred at the entrance to a viaduct. There was a downgrade in Austin Boulevard as one approached this viaduct traveling south. (Photographs of Austin Boulevard where admitted into evidence to aid the jury in evaluating the physical aspects of the accident scene.) Lubner parked the C.T.A. truck about six feet within the viaduct. His truck's front door on the right side was parallel with the viaduct's first concrete pillar. Lubner further stated that he then activated a mechanism which caused both rear lights of the truck to blink on and off. Earlier that morning, the crew had wired one red flag on each side of the truck's rear. There were also red flags in the truck which were bottomed in separate stands.

As this witness was leaving his truck from the curb lane side, the collision occurred. He regained consciousness at the scene of the accident and was taken to a hospital. He stated that he did not hear any horn or screeching of brakes before the impact nor was any warning given. He did not observe the plaintiff taking the salt box off the back end of the truck. Before the accident occurred, the plaintiff had walked to the rear of the truck, however. The empty salt box in question weighed

17

250 or 300 pounds. When the crew unloaded salt boxes, they dropped the truck's tailgate by loosening the supporting chains so that the tailgate was then even with the body of the truck. The salt boxes were then pushed from the body of the truck, onto the tailgate, and eventually to the street. Two men stood on the truck and two other men stood in the street gripping each side of the salt box as it was lowered to the street's surface.

Joe Lobue corroborated Lubner's testimony regarding the rear red lights of the truck blinking on and off and the red flags being wired to each side of the truck at its back end. In addition, Lobue stated that when Lubner stopped the C.T.A. truck, it was facing south and was four to six feet into the viaduct. The plaintiff then took a red flag, which was about four feet high and positioned in a stand, and placed it on Austin Boulevard about twenty-five or thirty feet behind the truck, which had been parked in the right curb lane. When the collision occurred, the plaintiff and this witness were on Austin Boulevard and were holding opposite ends of a salt box which was being tipped from the truck by two co-workers. The plaintiff was in the lane closest to the curb when a car struck the parked truck and pushed the C.T.A. vehicle forward. Lobue did not see the car approaching as he had his back to it. He did not hear anything before the collision, and after the truck was struck, he saw that the salt box was lying on top of Salvatore Toia.

Salvatore Toia testified that Lubner parked the truck one quarter of its length inside the viaduct and three quarters outside the viaduct. This witness also saw the plaintiff put a red flag, bottomed in a stand, on Austin Boulevard about twenty-five or thirty feet behind the truck. This was done after the vehicle had stopped. When the car of the defendant struck the parked truck, the salt box was near the edge of the tailgate. The impact of the collision caused the chains supporting the

18

tailgate to break which in turn lowered the tailgate to a vertical position and the salt box fell to the street pinning this witness beneath it. He too was taken to the hospital.

The defendant, Beverly Kelly, was called by the plaintiff as an adverse witness and testified that she had traveled on Austin Boulevard before; that she was aware of the viaduct and the downgrade in the street when traveling southbound; that she was in the inside curb lane as she approached the viaduct; that the speed of her auto was approximately 25 m. p. h.; that she was looking straight ahead as she approached the viaduct but could not see into it; that she was first aware of the truck's presence when it was approximately three car lengths or forty-two feet in front of her; that she then saw the truck but did not see any men in the street; that she immediately applied her brakes, turned her wheels slightly to the left, but the right side of her auto struck the truck which was parked in the right curb lane; and that she saw no part of the truck and therefore assumed that it was either totally under the viaduct or in its shadow.

The plaintiff testified that at the time of trial he was still employed by the C.T.A. and now had light duty at and around the elevated stations. He had worked for the C.T.A. since 1929. On direct examination, the plaintiff stated that his back was normal before the accident. He also testified that about twenty-five years earlier he had lost four or five days from work due to a cold in his back. In the five-year period preceding this accident, during which time he had been dropping off salt boxes, the plaintiff had not lost any time from work, nor had he seen a doctor within this period of time. The plaintiff also testified that the red lights were blinking on and off in the rear of the parked truck and red flags were wired to each side of the truck in the rear. Further-

19

more, he had placed a red flag in Austin Boulevard at a distance of approximately forty feet behind the truck.

At the time of the accident, the plaintiff further testified that he was facing south on Austin Boulevard along with Lobue. They were assisting two other co-workers in unloading an empty salt box. He tried to hold up the box after the accident had occurred, but his efforts were unsuccessful as the force of the collision had caused the tailgate to drop and the salt box dropped with it. He was forced to release the box, and he fell against the curb hitting his spine against it in the process. The plaintiff then walked to a nearby place of business and had someone there call the police. Upon returning to the scene of the accident, he saw that the truck was now completely beneath the viaduct whereas Lubner had parked it earlier halfway outside the viaduct.

The plaintiff was not taken to the hospital, but later on the day of the accident, he noticed that he had pain in his back. When he reported to work the next day, the plaintiff told his foreman that he could not unload salt boxes because his back bothered him. In the ensuing two weeks, the plaintiff had only light duty. He then stopped working. He saw a doctor ten or fourteen days after the accident. In a space of approximately three months, the plaintiff consulted five doctors, among them Dr. Richardson, a chiropractor, and finally Dr. Miller, an orthopedic surgeon. The plaintiff saw Dr. Richardson within three weeks after the accident. He consulted with Dr. Richardson on a regular basis of twice a week for three weeks, but his back and left leg continued to cause him increasing pain. The plaintiff then stopped seeing Dr. Richardson and saw two other doctors before he came to Dr. Miller, the orthopedic surgeon, in early February, 1959, approximately three months after the accident.

Dr. Miller hospitalized the plaintiff and operated on him. The hospitalization period was for eight days and the plaintiff did not return to work until May, 1959. His lost time from employment was approximately six

months. He stopped seeing Dr. Miller in June, 1959, and hasn't had any treatment by a doctor since then. His back continues to pain him.

On cross-examination, counsel for the defendant asked the plaintiff if he had any back problems before this accident. The plaintiff answered no to this question as well as to the query if he had a back problem in 1950 when he was off from work due to lumbago. The plaintiff did state that he still has pain in his back and in his left leg but not in the same degree of intensity as he had before the operation.

Counsel for the defendant asked the plaintiff in three successive questions whether the plaintiff had told Dr. Richardson, the chiropractor, that he had a back problem for twelve years. Each time the plaintiff answered no. His counsel objected to these questions unless counsel for the defendant intended to produce Dr. Richardson. The objection was overruled. Dr. Richardson never testified. Later in the trial, counsel for the plaintiff moved, in chambers, that the cross-examination of the plaintiff on this point be stricken and the jury be instructed to disregard it as Dr. Richardson had not testified. His oral motion was denied.

In final argument, counsel for the plaintiff tried to mention to the jury that counsel for the defendant owed an obligation to produce Dr. Richardson in light of defense counsel's cross-examination of the plaintiff as well as due to the fact that in opening argument to the jury, defense counsel had stated that the plaintiff had a prior back condition for some time. The objection of defense counsel to this argument was sustained by the court. In his written post-trial motion for a new trial on the issue of damages only or, alternatively, on all the issues, counsel for the plaintiff renewed his specific objection and again was overruled.

The only medical witness who testified at the trial was Dr. Donald S. Miller. He testified for the plaintiff and stated that he was the orthopedic surgeon to whom

21

the plaintiff had come in mid-February, 1959; that the plaintiff told him he had been involved in an accident when he was lifting a very heavy box on the back of a truck and his back and left thigh now pained him; that the plaintiff did not give this physician any history of a prior back problem; that the patient had all the signs of a nerve being pinned or irritated—typical sciatica in the the doctor's opinion; that at this physician's suggestion, the plaintiff submitted to a myelogram to determine the precise location in the spine of the offending irritation; that an interpretation of the myelogram showed the sciatica was caused by a rupture of a disc located in the extreme lower part of the back; that the displaced or ruptured disc had to be removed to relieve the pain and the vertebrae had to be fused also to relieve the pain and to minimize the effect of the plaintiff's long-standing arthritis in this area of the lower back; that this witness performed such an operation, and that in his opinion, the ruptured disc was caused by the box.

In conclusion, Dr. Miller testified on direct examination that he saw the plaintiff twelve times after he left the hospital in 1959 and he also saw him approximately three months before the trial at which time he took X rays of the back area which had been earlier affected and observed that the plaintiff still had occasional pain in his back; flattening of the lumbar spine which normally occurs after a fusion; and a limitation in motion and mobility. Moreover, there was scar tissue around the operative site which is inevitable after any operation. The effect of scar tissue is the cause of some irritation in the back and somewhat down the leg. The scar tissue is an effective producer of pain in Dr. Miller's opinion.

On cross-examination, Dr. Miller stated that his associate took a medical history of the plaintiff before Miller saw him which history indicated that the onset of the plaintiff's physical pain occurred approximately three months before this examination and two days after the

plaintiff had lifted a heavy box. It was Dr. Miller's opinion that although a few ruptured discs develop as a result of no provocation, most of them are caused by some incident of trauma. In conclusion, Dr. Miller testified that a single incident could injure a healthy disc; that there is no medical relationship between arthritis and a ruptured disc; and that lumbago is pain in the back whereas sciatica is pain in the leg. This concluded the medical testimony.

Stanley Mailuck, an accountant for the C.T.A., testified for the plaintiff regarding the dollar amount of wages the plaintiff lost for the six-month period he was unemployed following the accident. This sum was approximately $2,356. On cross-examination, he stated that the earnings of the plaintiff rose after 1958 (the year of the accident). From 1960 to 1965, the yearly earnings of the plaintiff had shown a cumulative increase of $1,125.

The defendant presented two witnesses in her behalf: the defendant herself and Ralph Umstot, a statistician in the C.T.A. insurance department. The testimony of the defendant was quite similar to what she had said earlier in the trial as an adverse witness. She did mention that she did not see a red flag in the street as she was driving southbound on Austin Boulevard approaching the viaduct; that she did not see the truck before the accident but rather just an object in her path; that there was a difference in light on the day of the accident when contrasting the viaduct area with the approach to the viaduct; and that the impact of the collision between the right front bumper of her car and the left rear of the C.T.A. truck did not cause her six-week-old baby to be thrown from her car bed nor was the car bed disturbed in its fixed support. On cross-examination, the defendant testified that in her pretrial discovery deposition she had stated that she saw the C.T.A. truck before the accident and at that time, her auto was three car lengths from the parked truck.

Ralph Umstot, a C.T.A. insurance statistician, stated that the C.T.A. insurance records showed that the plaintiff had lost time from work in June, 1950, due to lumbago as well as four days in 1957 due to bursitis in the left shoulder. According to the records kept by his department for employee benefit purposes, these were the only absences shown for the plaintiff in the period of 1950 to 1957.

On appeal, the plaintiff maintains that prejudicial error occurred in this jury trial when counsel for the defendant laid the foundation for possible impeachment of the plaintiff and then did not produce the expected impeachment witness, Dr. Richardson. Furthermore, prejudicial error is also alleged to have occurred when the trial court refused to allow mortality tables into evidence which were tendered by the plaintiff in an effort to establish recovery for future pain and suffering. The plaintiff urges that the cause be remanded for a new trial on the issue of damages only, or alternatively, that the cause be remanded for a new trial on all the issues.

In response, the defendant contends that the jury award was adequate as there was no substantial evidence showing that the back condition of the plaintiff was caused by the accident but rather the back condition existed before the occurrence. In addition, the exclusion of the mortality tables is alleged to have been a proper ruling by the trial court in that there were no future damages to reduce to present cash value.

We hold that the amount of the jury award in this case, $2,500, is patently inadequate and the cause must be remanded for a new trial on the issue of damages only. It is probable that one of the reasons for the return of such a small verdict, in light of the injuries and pain and suffering testified to as being sustained by the plaintiff as a result of the collision, was caused by defense counsel laying the foundation for the impeachment of the plaintiff and then not producing the impeaching witness,

Dr. Richardson. The trial court overruled the objection of plaintiff's counsel to this line of questioning unless Dr. Richardson was produced; refused to strike the cross-examination of the plaintiff on this point and instruct the jury to disregard it when defense counsel admitted in chambers that he was unable to produce Dr. Richardson; and sustained the objection of defense counsel when plaintiff's counsel, in closing argument, attempted to tell the jury that defense counsel had an obligation to produce Dr. Richardson. These actions by the trial court might have somewhat supported the innuendo created by defense counsel's specific questions of the plaintiff on cross-examination that the plaintiff had in fact sustained a prior unrelated back problem and possibly, in the eyes of the jury, placed an obligation on the plaintiff to produce the missing Dr. Richardson as a witness rather than the defense, although defense counsel, and not plaintiff's counsel, had originally laid the foundation for possible impeachment.

■ ■ The trial court held that the three successive questions asked of the plaintiff on cross-examination as to whether the plaintiff had told Dr. Richardson that the plaintiff had a back problem for twelve years were proper at the time they were asked, and it was not going to strike that testimony of the plaintiff at a later point in the trial and instruct the jury to disregard it. The trial court was of the opinion that such action on its part could cause the jury to think that defense counsel was not acting in good faith. Defense counsel admitted, but not before the jury, that he could not produce the possible impeaching witness, Dr. Richardson, because the chiropractor was allegedly in New York and therefore immune from service of a subpoena. We are of the opinion that once defense counsel lays the foundation for impeachment, he, and not counsel for the plaintiff, is under an obligation in law to produce the impeaching witness. If he fails to meet this obligation, the trial court must

strike any applicable cross-examination and instruct the jury to disregard it, or, at the insistence of the plaintiff, declare a mistrial.

At the trial, defense counsel suggested a reason for asking the plaintiff these questions regarding Dr. Richardson and the alleged disclosure by the plaintiff to the chiropractor of the patient's prior back condition. It was defense counsel's contention that at his pretrial discovery deposition, Dr. Richardson had brought with him his case record pertaining to the treatment of the plaintiff. This case record had on it the following entry: "Lower lumbar— . . . sciatic, dur. chronic, 12 yrs., dur. acute 5 years." It was indicated out of the presence of the jury that Dr. Richardson, at the deposition, had explained this entry to be that the plaintiff had told him that he had this pain once before, twelve years previous, but it had cleared up within a month or so. Chronic to Dr. Richardson meant that the plaintiff had this trouble in his back once before twelve years ago. Defense counsel asserted at the trial, in chambers, that he asked the plaintiff this question regarding whether he had told Dr. Richardson that he had a back problem for twelve years in an attempt to gain an explanation of this ambiguous entry on the doctor's case record. In our opinion, this explanation does not cure the inherent unfairness of a trial technique which lays the foundation for possible impeachment and then does not produce the impeaching witness. The plaintiff was not the proper party to be questioned regarding an alleged ambiguity in Dr. Richardson's case record.

As was aptly stated by this court in Gordon v. Checker Taxi Co., 334 Ill App 313, 318, 79 NE2d 632, 634 (1948), in reversing and remanding a judgment for strikingly similar conduct of defense counsel:

> ". . . The questions propounded on cross-examination of plaintiff, . . . were proper if asked in good faith for the purpose of impeachment in the event

26

of denial, and had objection been made the court would be obliged to overrule the objection. Proof of the facts involved in such questions would obviously affect plaintiff's present claim for injuries, pain and suffering. Innuendoes involved in such questions are sometimes more damaging than an effort to prove the impeaching facts. *When no witness is offered to impeach plaintiff and, therefore, no opportunity for cross-examination presented, the prejudicial effect springing from such questions cannot always be overcome, and results in an unfair trial to a plaintiff.* . . . (O)r suppose questions were asked concerning alleged conversations with others, which involves very damaging supposed admissions against interest, and though denied by the witness, no proof is offered to impeach, such type of cross-examination, if approved, could succeed in defeating many a meritorious cause." (Emphasis supplied.)

See also Townsend v. Chicago Transit Authority, 1 Ill App2d 77, 81, 116 NE2d 170, 171 (1953), wherein this court stated that the trial practice of laying a foundation for impeachment by questioning and then failing to follow up with proof is to be strongly criticized.

■ Justice would not be served by remanding this cause for a new trial on all the issues. In the trial of this case, the jury returned a general verdict in favor of the plaintiff. No cross-appeal is now before this court urging that the verdict of the jury is against the manifest weight of the evidence. Indeed, the evidence in this record amply supports the verdict of the jury as to liability. The plaintiff sustained the allegations in his complaint. Dr. Miller testified to the causal connection between the accident and the operation on the plaintiff for a displaced disc and vertebrae fusion. He said displaced discs are usually caused by a trauma, which could be a single incident. The striking of the plaintiff's spine against the curb which was caused by the collision be-

tween the moving car of the defendant and the parked C.T.A. truck might have been such a trauma in the judgment of the jury when it returned its general verdict for the plaintiff.

The defendant testified that the parked C.T.A. truck was either totally under the viaduct or in its shadow when she struck the vehicle, and she did not notice a red flag in the street. Witnesses for the plaintiff and the plaintiff himself testified that the C.T.A. truck was only partly inside the viaduct; its rear red lights were blinking on and off; red flags were on both sides of the truck in the back; and a stationary red flag was put in Austin Boulevard by the plaintiff at a distance of thirty to forty feet behind the parked truck. Presented with this substantial conflict in the evidence, the jury resolved them in favor of the plaintiff by the return of its general verdict in his favor. The cause will be remanded for a new trial on the issue of damages only. There is precedent for such a remedy. Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 45–46, 139 NE2d 275, 285–86 (1956); Mineiko v. Rizzuto, 65 Ill App2d 35, 212 NE2d 712 (1965).

Mortality tables were tendered by the plaintiff for consideration of the jury in assessing damages for future pain and suffering. Defense counsel objected to the admission of such evidence. The trial court sustained the objection on the grounds that mortality tables are competent evidence only when there is proof of loss of future earnings. In this case, undisputed evidence showed that the earnings of the plaintiff had increased in the years following his operation. On appeal, the plaintiff maintains that the trial court committed reversible error in excluding these mortality tables as evidence was introduced showing that the plaintiff was going to incur future pain and suffering and mortality tables are admissible for the purpose of establishing recovery for future pain and suffering.

28

■ We hold that the trial court was correct in excluding these mortality tables from evidence when proffered by the plaintiff. It is the law in this jurisdiction that mortality or life expectancy tables are competent evidence in wrongful death actions (Calvert v. Springfield Light Co., 231 Ill 290, 294, 83 NE 184, 186 (1907)) and in personal injury cases but only, in personal injury cases, where the evidence shows that the injury is permanent. Avance v. Thompson, 387 Ill 77, 83–84, 55 NE 2d 57, 60 (1944); Stegall v. Carlson, 6 Ill App2d 388, 392–93, 128 NE2d 352, 353–54 (1955). See also, an annotation on this subject in 50 ALR2d 419 et seq.

If a personal injury sustained by the plaintiff is shown by the evidence to be permanent, the life expectancy of the plaintiff is a relevant and material issue for the jury's consideration when it assesses compensatory damages to be awarded the plaintiff. It is apparent that the damages suffered by the plaintiff in such a case will not end until he dies. However, if a personal injury is not permanent, the introduction of mortality tables could lead to excessive jury awards as the plaintiff could conceivably receive compensatory damages for a period of time in excess of which he would have been damaged by the conduct of the defendant. This apparently is the underlying rationale for the judicial policy in this State that mortality tables are not competent evidence in personal injury cases unless the plaintiff has incurred a permanent personal injury.

The same rationale must be extended to cases involving future pain and suffering where the personal injury incurred is not a permanent one. Since the injury is not permanent, it and any accompanying pain and suffering might come to an end long before the plaintiff dies. To introduce mortality tables into evidence in such a case would be illogical and could quite conceivably lead to grossly excessive jury awards. Furthermore, pain and suffering is not such a fixed and certain quantity

which is capable of being accurately measured and estimated by duration of time. It ebbs and flows in various degrees of intensity over the duration of time. We are of the opinion that a sound judicial policy supports the rule of law in this jurisdiction that mortality tables are admissible in personal injury cases only when the evidence shows that the injury is permanent. Proof of future pain and suffering is insufficient to gain the admission of mortality tables where the personal injury sustained is shown to be not a permanent one. Although counsel for the plaintiff in such cases will not have mortality tables in evidence, he can still argue to the jury in support of his contention that a certain sum of money should be awarded to the plaintiff to compensate him for future pain and suffering. Whatever sum is fixed by the jury as compensation for future pain and suffering is not reduced to present cash value.

■ In the instant case, the orthopedic surgeon, Dr. Miller, stated that he removed the displaced disc of the plaintiff and the operation was a success. The plaintiff returned to work within six months after the accident and within approximately three months after the operation. Uncontradicted evidence showed that his yearly earnings increased after the accident. The plaintiff himself testified that he has not had treatment for his back since June, 1959. Thus, the plaintiff did not sustain any permanent disability or permanent personal injury. Both Dr. Miller and the plaintiff testified to the incurrence of future pain and suffering. Future pain and suffering, without accompanying a permanent personal injury, is not sufficient in our opinion to permit the introduction of mortality tables which attempt to measure the duration of a given plaintiff's life. The trial court properly excluded the mortality tables from evidence.

One other facet of this case remains to be briefly discussed. The plaintiff, on direct examination and not in response to any specific question addressed to him by his counsel, candidly and extemporaneously admitted that he "left the hospital before 2:00 p. m. because I had no insurance coverage." On cross-examination, the plaintiff admitted that his hospital and doctor bills had been paid in full by his employer. Counsel for the plaintiff agreed to such cross-examination rather than have the trial court perhaps declare a mistrial. Later in the trial and out of the presence of the jury, counsel for the plaintiff asked the court if he could mention to the jury that although the plaintiff's employer had paid the medical expenses, his employer was now pursuing a subrogation claim against the insurer of the defendant. The trial court ruled that no further mention of insurance coverage should be made to the jury. However, in closing argument to the jury, counsel for the defendant stated that "you heard this man's (the plaintiff's) testimony that he left (the hospital) eight days earlier because he didn't have insurance. He was forced to admit this because he said that he didn't have to pay the hospital bill. And I wonder if that isn't the treatment that should be given to the whole thing." Counsel for the plaintiff objected to this closing argument. His objection was overruled by the court.

 At the retrial of this cause on the issue of damages only, we trust that there will be no mention by either party of insurance coverage or the lack of it. Insurance, as a general rule, is not relevant to the issues of fault and damages proximately caused by such fault. Seyferlich v. Maxwell, 28 Ill App2d 469, 475, 171 NE2d 806, 809 (1961).

Within the facts of this case, the liability of the defendant was established. Since the jury properly decided the liability issue and improperly decided the ques-

31

 \

tion of damages, the judgment will be reversed as to damages only. The cause will be remanded for a new trial on this issue.

Reversed and remanded with directions.

BURKE and McCORMICK, JJ., concur.