DONNA RUTH HACKETT, Plaintiff-Appellant, v. EQUIPMENT SPE-CIALISTS, INC., Defendant-Appellee and Third-Party Plaintiff-Appellee (Custom Farm Seed Company, Third-Party Defendant-Appellant).

First District (6th Division)   No. 1—88—1769

Opinion filed February 9, 1990.—Modified on denial of rehearing September 7, 1990.

Lane & Munday, of Chicago (Fred Lane and John J. Munday, of counsel), for appellant Donna Ruth Hackett

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James Ferrini, of counsel), for appellant Custom Farm Seed Company.

Baker & McKenzie, of Chicago (Frank D. Morrissey, Thomas F. Tobin, Michael A. Pollard, and Kathleen M. Dedmon, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Donna Ruth Hackett, was injured while working on machinery manufactured by defendant, Equipment Specialists, Inc., and she filed a products liability suit against defendant. Defendant filed a

third-party action against plaintiff's employer, third-party defendant Custom Farm Seed Company.

Following a trial, a jury found in favor of plaintiff and against defendant, awarding $872,340 in compensatory damages. However, the jury found plaintiff had assumed 45% of the risk of her injury and reduced the total award to $479,787.

In the third-party action, the jury found in favor of defendant/ third-party plaintiff and against the third-party defendant. The jury apportioned 100% of the damages to third-party defendant and 0% to defendant/third-party plaintiff.

Plaintiff appeals from the judgment entered on the jury verdict in favor of plaintiff and against defendant. Plaintiff contends that the trial court erred in permitting third-party defendant's witness to give expert opinions; that defendant failed to perfect the impeachment of plaintiff's expert witness; that the jury's finding that plaintiff assumed 45% of the risk was against the manifest weight of the evidence; that defendant's closing argument in regard to damages had no basis in the evidence and was misleading; and that defendant's closing argument included improper attacks on plaintiff's attorney. The third-party defendant appeals, contending that the jury award constitutes full indemnity for defendant, which is impermissible. We summarize the relevant evidence.

In 1975, third-party defendant entered into a contract with defendant for the manufacture and installation of a corn-husking system designed to mechanically remove husks from ears of corn, which third-party defendant used in its small farm products processing business. The contract provided that defendant "assumes total responsibility for all phases of" equipment installation, and third-party defendant "has no responsibility in this area." It was also defendant's "express responsibility *** to operate each function of the plant and all pieces of equipment to determine that all processes throughout the plant operate in the manner designed." Finally, it was defendant's "responsibility to explain each operation permitting Custom management to completely understand all phases of the operation as well as variables within the operation for corn processing."

The husking process is set up through four husking bins. Inside each bin are rubber fingers which rotate to remove the husks from the corn. The corn then moves out of the husking bins and drops to a sorting table. The husking bin is located directly above the sorting table. The table is a continuously moving conveyor belt which moves the ears of corn out of the building and on to the drying process. The belt runs the entire length of the husking building. The belt has a motor-

driven roller on one end. That roller causes the belt to turn in a circular fashion. The other end, where plaintiff was injured, consists of an idle roller that was turned by the moving belt as the belt completed its continuous circuit. The idle roller had no motor attached. As the belt moved around the idle roller, a pinch or "nip" point was created. As an object came into contact with the pinch point, the turning pulley and moving belt would draw the object in towards the roller, crushing it between the belt and the roller. No guards were present at the pinch point. The third-party defendant had installed a guard by the motor-driven roller.

Just after high school graduation, plaintiff began working for third-party defendant in 1980, detasseling corn in the corn fields. She became a sorter in September 1980, one month before the accident. She was to ensure that the corn coming out of the husking bins had been properly husked. If husks remained on the ears when they dropped on the sorter table, plaintiff was to throw the corn back up into the husking bin to be reprocessed. On October 7, 1980, plaintiff was injured when she reached into the tail-end roller area to retrieve an ear of corn. Her hand became caught in the roller. Subsequently, her arm was amputated above the elbow.

Everette Ward, a former employee of defendant, testified for plaintiff that defendant was obligated to provide a system ready for operation. Ward testified, however, that he had no expertise in equipment safety. Ward testified that defendant knew the corn could fall from the top belt to the lower, return portion of the moving belt. Defendant was aware that the corn could come into contact with the "nip" point on the idle roller. Defendant did not install guards at the nip points. The guards were relatively simple to install and later machines installed by defendant included such guards.

Brenton McKee, third-party defendant's president, testified that he was informed by defendant that the equipment as designed and installed met Occupational Safety Health Act (OSHA) requirements. The third-party defendant voluntarily sought OSHA inspections, which were made annually. OSHA did not recommend that guards were needed. All recommendations made by OSHA personnel were followed. However, McKee knew that OSHA regulations required that the pinch point be guarded. He did not instruct the company's safety manager to install a guard at the pinch point. He assumed the plant manager would know that OSHA required the pinch point to be guarded.

McKee testified that defendant never recommended to the third-party defendant that it install guards at the tail end of the conveyor

belt system. Third-party defendant placed safety warning signs on each of the four husking bins. It instructed employees not to unclog a husking bin, and not to put a hand into the husker. The employees were not told to avoid putting their hands near the "nip point" created by the conveyor and tail pulley because management never saw employees put their hands into that area, and never expected anyone to do so.

McKee knew that a pinch point was created between the lower belt and the roller at the tail end of the sorting table. He also knew that if a worker put a hand in the pinch point, the hand would get caught.

Francis Dwayne Brushingham, an employee of defendant, testified for third-party defendant that employees were instructed regarding moving equipment. They were told never to clean any portion of the lower belt. The employees were not told, however, to avoid placing their hands near the "nip" point.

Professor Ralph Barnett testified for plaintiff as an expert in safety engineering. He opined that the condition of the machine as designed and installed by defendant was unreasonably dangerous. "And that condition mainly is a nip point at the tail end of the pulley. That particular place on the unit is a hazard, and that means that that is a place on this conveyor where you have an injury potential." The hazard could be eliminated by installing a guard. It was the joint responsibility of the installer and the operator of the equipment to provide suitable guards and warnings for machinery under applicable safety standards.

Plaintiff testified that her supervisors had showed her various warning signs. The signs read: "Danger. Hand Hazards. Watch Your Fingers"; and "Be Safe. Keep Away From Moving Parts." Plaintiff was instructed never to try to unclog a husking bin or put her hands into the husker. She had never been warned about a danger created by the pinch point at the tail end area. She was not aware of any danger created by the pinch point.

Plaintiff was generally aware that body parts should be kept away from moving equipment. On the husking system, plaintiff could see the rollers turning and had seen supervisors use sticks to unclog the husking bins. She could "sort of" see the lower belt and "might have seen it moving." Plaintiff knew there was a stop button for the husking system located near her work station. The stop button stopped all machinery in the building. The sorting table was stopped when workers needed to clean the table. She usually wore loose-fitting, white cotton work gloves.

Plaintiff testified that on the day of the accident one load of corn had been processed and plaintiff stepped back from the conveyor to await another truckload of corn. It was one minute before lunch and five minutes after the corn had stopped running. She saw two cobs of corn which had fallen between the upper and lower levels of the moving conveyor belt. They were gently spinning or tumbling against the idle roller. She did not stop to think about what was making them spin, but was aware of the moving belt. She easily removed the first ear. The second ear was deeper and could be seen by stepping back and bending down towards the lower belt. Plaintiff positioned herself so her head was above the belt, blocking her view, and she reached in to remove the corn. Her gloved fingers made contact with the pinch point, and her right hand and arm were pulled into the machine.

Plaintiff also testified regarding her daily use of the prosthetic devices she required. There was a mechanical arm and the myoelectric or "Utah" arm.

Plaintiff's mother, Donna Hackett, testified that she also worked for third-party defendant. Safety signs were prominently placed on each machine. Employees were told not to put their hands in a husker. Plaintiff's mother also testified regarding plaintiff's use of the prosthetic arm.

Jack East, a social worker, testified for plaintiff as an expert in prosthetic and other needs of amputees. He recommended that plaintiff have two myoelectric "Utah" arms and one mechanical arm. He made certain cost projections based on that recommendation.

Dr. Dennis Pollack, a clinical psychologist, testified for third-party defendant as a vocational expert for disabled persons. Pollack telephoned about four people in the country and questioned them about the myoelectric "Utah" arm. He offered an expert opinion that the "Utah" arm was less desirable than the mechanical arm, and that no back-up arms were necessary.

Plaintiff first contends that the trial court erred in allowing Dr. Pollack to be qualified as an expert on prosthetic devices.

■ An expert is one whose testimony will assist the trier of fact to understand the evidence. (*Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 444 N.E.2d 220.) A witness testifying as an expert must possess special knowledge or experience in the particular area about which he expresses an opinion. (*Leonard v. Pitstick Dairy Lake & Park, Inc.* (1984), 124 Ill. App. 3d 580, 464 N.E.2d 644.) If the witness fails to show he possesses such knowledge, it is error to permit him to testify as an expert. *Hagerman v. National Food Stores, Inc.* (1972), 5 Ill. App. 3d 439, 283 N.E.2d 321.

Two prosthetic devices were available to plaintiff, a mechanical arm and a myoelectric "Utah" arm. East testified that purchasing and maintaining a myoelectric arm over plaintiff's lifetime would be $1,790,390. A back-up myoelectric arm was necessary, at a cost of $895,195. In contrast, purchasing and maintaining a manual or mechanical arm would be $45,537.

In a *voir dire*, plaintiff was allowed to explore Dr. Pollack's qualifications as an expert in the area of prosthetic devices. The court overruled plaintiff's objection and qualified Dr. Pollack as an expert.

Dr. Pollack then testified that in his opinion plaintiff should use a mechanical arm, not a myoelectric arm. Furthermore, even if she used a myoelectric arm, no second, back-up arm was necessary.

■ We agree that for the jury to resolve the significant difference in the damages requested for the two types of prostheses, testimony regarding the desirability of one prosthetic device over the other required an opinion from a person of skill and experience in that field.

Dr. Pollack, while he may have had excellent qualifications in the field of employment counseling for handicapped persons, was not an expert in the field of prostheses. In the *voir dire*, Dr. Pollack repeatedly emphasized that he was not a qualified expert in prosthetic devices:

"PLAINTIFF'S ATTORNEY: Isn't it correct that you do not hold yourself out to be an expert in prosthetic devices?

DR. POLLACK: That is correct.

Q. And isn't it a fact that the survey that you did was just to gather information about the Utah arm just like anybody else could gather information?

A. That's true. It was to gather information.

Q. So you are not an expert in the—in the repair and replacement of prosthetic devices?

A. No.

Q. You're not an expert in the use of mechanical—of prosthetic devices; is that correct?

A. Only insofar as vocationally.

Q. All right. You're not an expert even vocationally in the use of the Utah arm; is that correct?

A. Of the Utah arm, no.

Q. And your testimony here then is from a survey that you did?

A. That's correct.

Q. Is that correct?

A. Yes.

Q. And the survey that you did was the same survey that could be done by anybody else; is that correct?

A. That's correct."

Dr. Pollack later testified similarly:

"DR. POLLACK: Am I an expert? I think there's [*sic*] two different parts that I think you're getting at. Do I have knowledge about the area of prosthetic devices? Yes, I have knowledge.

As a vocational expert, can I go obtain knowledge about prosthetic devices particularly as they relate to work? I can do that.

The next question is, am I a prosthesis specialist? No, I'm not. I don't claim to be.

PLAINTIFF'S COUNSEL: Do you have any expertise in the advantages of one system over another? Because that's what we're talking about here.

DR. POLLACK: Only from the knowledge that I've gained when I went out to gain from the survey."

We agree with Dr. Pollack's refusal to characterize himself as an expert in the field of prostheses. Dr. Pollack is a clinical psychologist specializing in the evaluation and job placement of disabled people. He has performed 1,200 to 1,500 evaluations of the physical requirements of various jobs for SSA. Ninety percent of his practice is devoted to the evaluation and job placement of people with mental and physical handicaps. In this case, he was asked to evaluate the record to see if plaintiff was employable as a graphic artist. Thus, he familiarized himself with her particular handicap, and he visited businesses to determine what duties a graphic artist performs. In considering a job opportunity, he takes into account the prosthetic device to be used. He had no familiarity with the Utah arm. The only basis for his opinion that the mechanical arm was preferable to the Utah arm was a telephone survey he took.

Dr. Pollack lost the names of the three or four prosthetists he spoke with and could only remember which cities they lived in. He was not familiar with their qualifications. He obtained their names "[f]rom other prosthetists and phone books. That's where I got them." He thought two of the prosthetists recommended against using the Utah arm.

There is nothing in either Dr. Pollack's educational background or experience that qualifies him to offer an expert opinion as to the advantages of one type of prosthetic device over another. His extensive

background, and the true value of his testimony here, related only to plaintiff's vocational opportunities. He performed the type of vocational evaluation which he had previously performed thousands of times. He concluded that plaintiff could work and was employable as a graphic artist. His expertise stopped at that point. The attempt to tack on a somewhat related but quite distinct expertise in prostheses by slipping in the telephone survey failed to transform a disabled person's vocational expert into an expert experienced or trained in principles necessary to compare the state of the art prostheses at issue here.

In permitting Dr. Pollack to testify, the trial court analogized to a "medical doctor who comes up against a problem he's not familiar with, going to the books for the first time," and "what he reads in those medical books is beyond the average layman picking up the telephone and calling two or three guys in the profession that really know something about it and asking them their opinion and then applying his knowledge to what he already knows plus whatever they gave him to giving an opinion on that subject to the patient." Significantly, however, the medical doctor must first be trained or experienced in the area of medicine, and then he might add to that training or experience by reading more specialized medical literature or consulting with other identified, qualified experts. (See *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) In this case, Dr. Pollack started out with no training or technical experience in the field of prosthetic devices, and added to that total lack of knowledge by "consulting" with unidentified, possibly unqualified persons. See *Vazirzadeh v. Kaminski* (1987), 157 Ill. App. 3d 638, 510 N.E.2d 1096.

Third-party defendant argues that plaintiff's expert on prosthetics, Jack East, was no more qualified than Dr. Pollack. Third-party defendant maintains that their qualifications were virtually identical.

In 1972, East formed a nonprofit organization called American Amputees Foundation. One of its primary functions is to provide amputees with information about technological advances in the area of prosthetics. Moreover, as a licensed social worker he is required to attend 48 hours of continuing education classes every two years. Within that field, he chose biomedical engineering, which includes prostheses. He also writes a column for amputees in a publication reaching 18,000 consumers every quarter. The column provides information on state of the art prosthetics. This requires evaluation and testing of equipment. Moreover, the Foundation's computer data base includes a network of professionals involved in prosthetics.

East, unlike Dr. Pollack, offered extensive testimony detailing the

specific attributes of the Utah arm, its unique qualities, the functions it can perform, and its components, including electronic circuitry and microchips. He explained some of the recent refinements on the Utah arm. He had worked with six people who use Utah arms.

In conclusion, the only thing third-party defendant accomplishes by inviting us to compare Dr. Pollack's and East's qualifications is to further highlight Dr. Pollack's complete lack of experience to qualify him as an expert on this issue.

We hold that the trial court abused its discretion (see *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257) in qualifying Dr. Pollack as an expert qualified to give an opinion on the desirability of using one prosthetic device over another.

Plaintiff next contends that defendant committed reversible error by failing to perfect the impeachment of plaintiff's expert witness, Professor Barnett. Barnett testified that the machine as designed and installed was unreasonably dangerous. In cross-examination and re-cross-examination, defendant's attorney questioned Barnett regarding a previous case in which Barnett had testified:

"Q. You have testified in the past in a case by the name of *Ciezadlo* that a conveyor about this size that had a tail pulley like this, that the tail pulley which was unguarded was guarded by location, have you not?

A. Many times I have testified that way when they're guarded by location.

Q. Right. And you testified on my behalf in the *Ciezadlo* case that an unguarded roller of this fashion was guarded by location?

A. Right, and you didn't have a work station there.

Q. And it was down on the floor like this; is that right?

A. That's correct.

Q. And the testimony there was that it was beside a walkway where people were coming by with the tools and the clothes and the long hair and all of the other ways that you have testified to today, and you still testified that it was guarded by location, did you not?

A. I'm very sorry, I don't remember any of those elements.

Q. You don't?

A. No.

* * *

Q. And in that same *Ciezadlo* case, the people who had long hair, it would get caught in this, and if people had hand tools were walking right by it, and the people that would slip and

get caught in it were all walking in the same place?

A. I'm sorry. I know nothing about that. You must have kept something back from me on that case.

Q. I'm sure I didn't, and I'm sure you were examined by that other lawyer on it."

■ In order to impeach a witness with a prior inconsistent statement, the impeachment must be completed by later offering evidence of the inconsistent statement if the statement was denied. (*Rigor v. Howard Liquors, Inc.* (1973), 10 Ill. App. 3d 1004, 295 N.E.2d 491.) It is reversible error to fail to offer substantive proof of the impeaching statements due to the highly prejudicial innuendo created through the incomplete impeachment. *Green v. Cook County Hospital* (1987), 156 Ill. App. 3d 826, 510 N.E.2d 3; *Danzico v. Kelly* (1969), 112 Ill. App. 2d 14, 250 N.E.2d 801.

■ Here, Barnett expressly and repeatedly denied testifying about the safety of unguarded conveyor belts in a manner directly opposing the expert opinion he offered in the present case. Defendant, however, made no attempt to complete the impeachment at any time during the remainder of the trial. The line of questioning would lead the jury to conclude Barnett had previously testified in a manner inconsistent with his trial testimony. Such error requires reversal for a new trial which is free from such prejudice.

■ Defendant, however, relies upon *Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 553 N.E.2d 291, for the proposition that plaintiff waived this issue by failing to object both to the admission of impeaching testimony and the failure to perfect the impeachment. *Gillespie*, however, is not authority for a holding of waiver by failing to object to proper questions themselves. There, the questions elicited the contents of a nurse's notes by another witness, a doctor. Bringing out the contents of the nurse's notes was improper. The plaintiff's attorney had previously kept out any reference to the notes on the ground that her notes were hearsay. During the examination of the doctor, who then testified about the nurse's notes, the plaintiff objected on the ground that the question was leading and later objected to the form of the question. Additionally, the plaintiff withdrew his objection to references to the nurse's notes during a deposition and used by plaintiff at trial, thus revealing "a calculated strategy to hear particular references to the nurse's note," but not hear other references to the same note. (*Gillespie*, 135 Ill. 2d at 374.) There is no requirement that plaintiff here had to object to the questions themselves, and *Gillespie* is not authority to the contrary on this narrow point.

■ We also note that the present case involved a blatant mischaracterization of fact and defense counsel's attack on Barnett's character. Defense counsel countered Barnett's repeated denials of certain facts in Ciezadlo with: "I'm sure I didn't [keep back facts from you], and I'm sure you were examined by that other lawyer on it." Defense counsel, in effect, testified himself that Barnett had previously offered an opinion contrary to the one he offered in this case, despite nearly identical facts; and that Barnett was lying about the factual basis of his opinion in the other case. Consequently, absent the perfection of that attempted impeachment, it was impossible for the jury to come to a fair decision based on the information before it.

Defendant contends that the impeachment was properly completed because, having indicated to Barnett that the prior statements involved the Ciezadlo case, Barnett had "enough information to protect him against unfair surprise and *** an opportunity to explain the statement with which he was confronted." This is not a proper manner of impeachment; it merely points to the preliminary step of laying a foundation. See *Sellers v. Hendrickson* (1977), 46 Ill. App. 3d 549, 554, 360 N.E.2d 1235.

Third-party defendant also argues that the impeachment was properly completed because "Barnett not only testified that he did so testify in the *Ciezadlo* case, but also stated that he had so testified in that manner on *many* occasions." That assertion distorts the testimony quoted above. Barnett merely stated that it is not necessary to install a guard on any particular portion of machinery if the location of the machine itself prevents workers from coming into contact with the moving parts. In this case, he pointed out that plaintiff's working station was immediately next to the pinch point area on the sorting table. Thus, there was no admission by Barnett which somehow completed the impeachment which counsel initiated.

Since we are reversing and remanding for a new trial, we address those remaining issues which will arise again on remand.

■ Plaintiff contends that the court erred in allowing defendant to include in closing argument remarks regarding an economic theory called the "Rule of 72." The basic rule, frequently used in similar cases, is that there is a formula for determining the length of time it will take for a given amount of money to double at a given compound interest rate. Thus, the formula is 72 divided by the interest rate. The theory permits the jury to calculate present value of some of plaintiff's damages. We find no error in the use of this type of argument. (See, *e.g., American National Bank & Trust Co. v. Thompson* (1987), 158 Ill. App. 3d 478, 484, 511 N.E.2d 1206; *Shaheed v. Chicago Tran-*

*sit Authority* (1985), 137 Ill. App. 3d 352, 360, 484 N.E.2d 542; *Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 725, 449 N.E.2d 250.) In regard to the mathematical errors to which plaintiff points, we assume that mathematical errors, if any indeed occurred, would not occur during the new trial.

Finally, plaintiff contends that the court erred in denying plaintiff's motion for a directed verdict on the issue of assumption of risk because the jury's finding that plaintiff assumed 45% of the risk of her injury was against the manifest weight of the evidence. (See *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 356 N.E.2d 32.) Plaintiff bases her argument mainly on the assertion that "defendant failed to offer one scintilla of evidence to prove that plaintiff knew and appreciated the risk of her injury." See *McCracken v. Westinghouse Air Brake Co.* (1981), 103 Ill. App. 3d 26, 430 N.E.2d 539; *Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 373 N.E.2d 1371.

■ The test for assumption of risk is whether plaintiff subjectively knew of the risk. (*Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 454 N.E.2d 197; *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) Even where plaintiff claims ignorance of the danger, cross-examination of plaintiff may sufficiently establish the defense of assumption of risk. (*Martinet v. International Harvester Co.* (1977), 53 Ill. App. 3d 213, 368 N.E.2d 496.) The jury's verdict will not be disturbed unless an opposite conclusion is clearly apparent or the findings of the jury appear to be unreasonably arbitrary and not based on the evidence. Where there is evidence that, if believed, would support the verdict, we will not interfere with the jury's decision. See *Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 358, 491 N.E.2d 1236; *Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 158, 349 N.E.2d 578.

Here, plaintiff, her mother, and several other witnesses testified regarding the warning signs placed at each work area. Plaintiff was instructed never to try to unclog a husking bin or put her hands into the husker. She was aware that body parts should be kept away from moving equipment. She knew a stop button located near her work station would stop the conveyor belt, and knew that the belt could not harm her if it were stopped. It was one minute before lunch, when the belt would be stopped. The belt was always stopped when workers needed to clean it. Plaintiff had never been instructed to clean the belt.

In addition to this general awareness of the alternatives to placing a loosely gloved hand near moving machinery, the method in which plaintiff removed the second ear of corn could lead a jury to

believe she assumed some risk. Plaintiff saw the corn tumbling or spinning against the roller. Plaintiff positioned herself so that her view of the moving roller, the ear of corn and her hand were completely blocked. She blindly stuck her arm into the pinch point area, reaching for the corn.

This evidence, if offered on retrial and if believed by the jury, would support a verdict apportioning some percentage of the risk of injury to plaintiff herself.

■ We limit our holding to the finding that there was sufficient evidence of assumption of risk to permit the jury to decide the issue. We in no way intend to indicate whether the 45% figure or any particular figure, even zero assumption of risk, would be more appropriate. On retrial, the question should be given to the jury.

Plaintiff's complaint that defense counsel made improper attacks on her attorney during closing argument is unlikely to recur on retrial, and we need not discuss it.

In the third-party action, third-party defendant Custom Farm Seed Company appeals from the judgment entered on the jury verdict apportioning 100% of the liability to third-party defendant, and 0% of the liability to defendant/third-party plaintiff Equipment Specialists, Inc. Third-party defendant contends that the jury, in the name of contribution, awarded defendant full indemnity, and such an award is impermissible under the law, both because the law does not provide for full indemnity and because defendant is an active tortfeasor.

The jury found defendant liable to plaintiff. It assigned 55% of the comparative fault to defendant. It necessarily concluded that defendant proximately caused plaintiff's injuries when defendant designed and manufactured a defective or unreasonably dangerous product. In fact, defendant offers no challenge to the jury finding of its culpability. Yet, the jury found defendant completely free of fault and also found third-party defendant 100% at fault.

Thus, as between plaintiff and defendant, plaintiff assumed 45% of the risk, and defendant was 55% at fault. But as between defendant and third-party defendant, the "55% comparative fault" disappeared completely.

Defendant is only entitled to contribution to the extent plaintiff's injury was caused by third-party defendant, and not by defendant. (See *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 19, 461 N.E.2d 382.) It is logically impossible, when the focus is changed from the plaintiff/defendant relationship to the defendant/third-party defendant relationship, for defendant's fault to disappear. Defendant still owed plaintiff a duty; still deviated from that duty; and still proximately caused

plaintiff's injury. The fact that third-party defendant *also* owed a duty, deviated, and caused the injury cannot expunge defendant's role. Moreover, defendant had obligations under its contract with third-party defendant to ensure the safety and proper functioning of the husking system.

■■ It is true that under the law of indemnity one tortfeasor could sometimes completely dissolve its own portion of fault and shift the entire burden to a joint tortfeasor. Generally, however, implied indemnity no longer exists in Illinois when contribution is available. (*Allison v. Shell Oil Co.* (1986), 113 Ill. 2d 26, 495 N.E.2d 496.) There still may be certain instances where a third-party plaintiff may receive 100% contribution from a third-party defendant. In *Doyle v. Rhodes,* the court noted that a right of indemnity or total contribution might still exist in limited circumstances not present before the court in that case, such as where one held liable for failing to correct a dangerous condition may seek full contribution from the party whose conduct was the sole proximate cause of the injury by creating the unreasonably dangerous condition. Here, however, the third-party plaintiff manufacturer could never prove it would not have designed and manufactured the dangerous product if the third-party defendant employer had not first failed to install a guard on the product. Similarly, we do not have a third-party plaintiff employer subject to liability because it failed to add a guard to a defective product, turning to a third-party defendant who manufactured and created the defective machinery.

■■ Defendant also maintains that the jury found that third-party defendant assumed the entire risk. Assumption of risk is no longer an appropriate basis for contribution. *J.I. Case v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 516 N.E.2d 260.

■■ Thus, in applying the legal principles under the rule permitting contribution between joint tortfeasors, it would seem impossible to uphold the jury's 0%/100% apportionment here. Under the record before us, defendant cannot be absolved of all responsibility under any theory of law in Illinois.

Defendant relies upon *Hanlon v. Airco Industrial Gases* (1986), 148 Ill. App. 3d 1039, 1047, 500 N.E.2d 494 to show a party found strictly liable can seek 100% contribution from another party who was actually and solely at fault. However, the jury in the present case found defendant at fault. Thus, the third-party defendant could not be *solely* at fault. Furthermore, in *Hanlon* the party seeking indemnity was the distributor, not the manufacturer of the product.

Defendant also relies on *Pipes v. American Logging Tool Corp.* (1985), 139 Ill. App. 3d 269, 274, 487 N.E.2d 424, for the principle that the jury can place the loss in proportionate amounts on those whose actions proximately cause the injury without traditional labels characterizing the kind of fault involved. However, even there the jury attributed 10% fault to the employer and 90% fault to the manufacturer of the defective product.

For the foregoing reasons, the judgments of the circuit court of Cook County on the principal complaint and on the third-party action are reversed and the cause is remanded for a new trial in accordance with the views expressed herein.

Reversed and remanded.

LaPORTA, P.J., and EGAN, J., concur.